## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **ANTISA DENISE COLUMBUS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION FILE NO.** |
| | : | **1:13-cv-04266-AJB** |
| **CAROLYN W. COLVIN,** | : | |
| ***Acting Commissioner of*** | : | |
| ***Social Security***, | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R   A N D   O P I N I O N[1]

Plaintiff Antisa Denise Columbus ("Plaintiff") brought this action pursuant to

section 1631(c)(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3), to obtain judicial

review of the final decision of the Acting Commissioner of the Social Security

Administration ("the Commissioner") denying her application for Supplemental

---

[1]     The parties have consented to the exercise of jurisdiction by the
undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil
Procedure.  (*See* Dkt. Entries dated 9/15/14 & 9/17/14).  Therefore, this Order
constitutes a final Order of the Court.

Security Income Benefits ("SSI") under the Social Security Act.[2]  For the reasons

below, the undersigned **AFFIRMS** the final decision of the Commissioner.

## I.      PROCEDURAL HISTORY

Plaintiff protectively filed an application for SSI on July 16, 2010, alleging

disability commencing on July 15, 2010. [Record (hereinafter "R") 107-14]. Plaintiff's

application was denied initially and on reconsideration. [*See* R55-75].  Plaintiff then

requested a hearing before an Administrative Law Judge ("ALJ").  [R76-77].  An

evidentiary hearing was held on January 20, 2012.  [R28-54].  The ALJ issued a

decision on April 23, 2012, denying Plaintiff's application on the ground that she had

not been under a "disability" at any time through the date of the decision.  [R14-22].

---

[2]      Title II of the Social Security Act provides for federal Disability Insurance
Benefits ("DIB").  42 U.S.C. § 401 *et seq*.  Title XVI of the Social Security Act,
42 U.S.C. § 1381, *et seq*., provides for SSI benefits for the disabled.  Unlike Title II
claims, Title XVI claims are not tied to the attainment of a particular period of
insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).
Otherwise, the relevant law and regulations governing the determination of disability
under a claim for DIB are nearly identical to those governing the determination under
a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005)
(citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  Thus, in
general, the legal standards to be applied are the same regardless of whether a claimant
seeks DIB, to establish a "period of disability," or to recover SSI, although different
statutes and regulations apply to each type of claim.  *See* 42 U.S.C. § 1383(c)(3)
(establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to
claims for SSI).  Therefore, to the extent that the Court cites to DIB cases, statutes, or
regulations, they are equally applicable to Plaintiff's SSI claims.

2

Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on November 20, 2013, making the ALJ's decision the final decision of the Commissioner.  [R4-8].

Plaintiff then filed the present action in this Court on December 26, 2013, seeking review of the Commissioner's decision.  [*See* Doc. 1].  The answer and transcript were filed on September 12, 2014.  [*See* Docs. 8, 9].  On October 16, 2014, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 11], and on November 17, 2014, the Commissioner filed a response in support of the decision, [Doc. 12].[3]  The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs, and it is accordingly ripe for review pursuant to 42 U.S.C. § 1383(c)(3).

---

[3]     Plaintiff did not file a reply brief, and no request for oral argument was filed.  (*See* Dkt.).

3

## II.    FACTS BEFORE THE ALJ[4]

### A.    *Background*

Plaintiff's date of birth is September 21, 1984, and she was therefore twenty-five years old at her alleged disability onset and twenty-seven years old at the time the ALJ issued his decision.  [R107].  She alleges disability due to anxiety, depression, and bipolar disorder.  [R40, 141, 180, 206].

### B.    *Lay Testimony*

#### 1.    *Plaintiff*

Plaintiff testified that she did not believe she could hold a job because she gets "real restless."  [R33].  She described difficulty focusing on job tasks when around other people and stated that she lost her last job—cashier in a fast-food restaurant—because she could not focus or "stay right," which led to a conflict with her supervisor.  [R33, 37].

When asked about substance abuse, Plaintiff indicated that she had not used cocaine since 2007, [R33-34]; quit using marijuana about six months before the hearing, [R34]; and rarely used alcohol, [R34].  She reported that she lived with her

---

[4]    In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal.  [*See* Docs. 11, 12].

4

mother and had two children who did not live with her.  [R35].  She testified that she had completed the eighth grade, [R36], and that she did not have a driver's license, [R35-36].

When the ALJ asked about a tax return showing that in 2007 Plaintiff had reported approximately $12,006 in self-employment income, Plaintiff said that she did not know and did not do her taxes.  [R37-38].  She also stated that she had been in and out of incarceration.  [R38].

Plaintiff reported that she stayed around the house all day and could sweep the floor, do laundry, and "try" to make the bed, but did not cook, wash dishes, take out the garbage, work outside in the yard, or go shopping.  [R41-42].  She indicated that she would go visit with her children on weekends.  [R41-42].

Plaintiff stated that she cannot focus when she is around other people and feels like everyone is against her.  [R42].  She described "blanking out" when she would have flashbacks to her past, and she stated that when she is around others she has mood swings.  [R44].  She reported that she has damaged property and hurt herself and others when upset.  [R44-45].

5

### 2.    Plaintiff's Friend

A friend of Plaintiff's testified that she had seen Plaintiff every day for a little over a year. [R51-52]. The friend testified that Plaintiff had taken to her, but that no one else in the neighborhood liked Plaintiff because Plaintiff "has went off on everyone, even like their parents." [R52]. The friend reported that Plaintiff was always trying to fight and was crying "all the time." [R52-53]. She indicated that Plaintiff did not finish tasks around the house and was prone to being distractible to the point of leaving the stove on. [R53].

### C.    Administrative Records

In an undated disability report, Plaintiff indicated that she worked for "various employers" in 2001 and again from 2006 through 2008, but that she stopped working on December 31, 2008, because of her condition. [R141-42]. She also reported that she earned a General Educational Development ("GED") certificate in 2008. [R141].

In an adult function report dated July 28, 2010, Plaintiff reported that she cooked for her mother, washed clothes and dishes when her mother encouraged her, researched colleges, often left the house, went on walks, shopped for clothing in stores, attended church, played with her children, and otherwise spent a lot of time with family. [R154, 156-58]. When asked to describe difficulties getting along with others, she

AO 72A
(Rev.8/8
2)

stated that her sister sometimes picks on her and that she did not like the police but tried to abide by their rules. [R159-60]. She indicated that she had no problem with her own personal care. [R155]. She reported that she could count change but was unable to handle a savings account, use a checkbook, or pay bills. [R157].

In an undated third-party function report, Plaintiff's aunt reported that Plaintiff hardly sleeps and sometimes needs to be reminded to fix her hair and dress appropriately. [R163-64]. She also indicated that Plaintiff did not have trouble getting along with family, friends, or neighbors, but that Plaintiff did not talk to people outside the family. [R167].

A report of contact dated December 16, 2010, indicated that Plaintiff had been in jail from March 30, 2007, through July 15, 2010, and that she had a GED certificate. [R170].

An adult function report[5] dated February 19, 2011, indicates that Plaintiff had attitude issues and mood swings, only talked to her mother, "hated" authority, and feared people. [R201-02].

---

[5]    The report was written from Plaintiff's point of view but was signed by Ross Mincey. [R196-203]. The court has been unable to locate anything in the record describing Mr. Mincey's relationship to Plaintiff.

### D.    Medical Records

On August 11, 2010, Plaintiff was seen by Margaret A. Redus, LCSW, at the DeKalb Community Service Board.  [R274].  Ms. Redus noted that Plaintiff admitted to being very irritable, isolating herself, having difficulty concentrating, having anhedonia,[6] and having poor sleep/appetite.  [R274].  Ms. Redus further observed that Plaintiff had a blunted/flat affect.  [R274].

On August 12, 2010, Plaintiff returned to the DeKalb Community Service Board for a psychiatric diagnostic interview with Jean H. Robinson, M.D., upon referral by "the prison system."  [R275].  It was noted that Plaintiff had been given medication in prison for depression, bipolar disorder, and post-traumatic stress disorder ("PTSD").  [R275].  Plaintiff reported depression, periods of excessive energy/feeling hyperactive, and anger, with some destructive outbursts.  [R275].  Her current medications were Tegretol, Zoloft, and Wellbutrin, which, she reported, kept her "mellow."  [R275].

During her interview with Dr. Robinson, Plaintiff reported visual and tactile hallucinations that started after a friend died in her company; she felt she did not "do enough" to save him.  [R275].  She admitted to paranoia and feeling that people are

---

⁶       Anhedonia is the inability to derive pleasure from most activities.  *See* Anxiety Disorders Association of America, Depression, http://www.adaa.org/understanding-anxiety/depression (last visited 9/7/15).

8

watching her, talking about her, and thinking of doing something to her. [R275]. She reported having racing thoughts most of the time. [R275]. She stated that she had been in school through the eleventh grade and had earned a GED in prison. [R276].

Dr. Robinson found that Plaintiff had a mood disorder that persisted in prison, long after any drug or alcohol use, and she noted that Plaintiff experienced mood changes from depression to agitation to anger. [R276]. Dr. Robinson also found that Plaintiff had symptoms of PTSD, plus hallucinations related to her teen prostitution and to her friend's death. [R276]. Dr. Robinson assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 47.[7] [R274].

On October 6, 2010, Plaintiff returned to the DeKalb Community Service Board and briefly met with Jennifer L. Whaley, M.D., after arriving several hours late for her appointment. [R372]. Plaintiff reported that she did not feel her medication was working because she got angry often and felt agitated and restless. [R372]. She also indicated that she was not sleeping at night but napped during the day. [R372].

---

[7]     The GAF is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental-health illness. *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

Dr. Whaley assessed Bipolar NOS; discontinued Tegretol for ineffectiveness and because Plaintiff was at risk for pregnancy; started Risperdal; and continued Zoloft and Wellbutrin.  [R372].

At an appointment with the DeKalb Community Service Board on December 1, 2010, Plaintiff reported that her mood and sleep had stabilized with medication but that she was eating less.  [R376].  She was continued on Risperdal, Zoloft, and Wellbutrin.  [R376].

On December 6, 2010, Plaintiff presented to Steven Snook, Ph.D., for a consultative psychological evaluation.  [R388-92].  Plaintiff stated that she was unable to work because it was hard to be around people and concentrate, and she described difficulty with thinking when under stress.  [R388-89].  She also reported that she had been expelled from school in the eighth grade and never received a GED.  [R389].

Plaintiff reported that she had last been employed in 2007, as a cashier at a fast-food restaurant.  [R389].  She indicated that she got along fairly well with fellow employees and supervisors there but that the job ended when she "was laid off." [R389].

Plaintiff indicated that she had been receiving mental health treatment through the DeKalb Community Service Board's Kirkwood Mental Health Center for a mood

10

disorder and possible PTSD.  [R389].  She stated that she was taking Risperdal, Wellbutrin, and Zoloft.  [R389].  She also reported that she had been treated in prison with medication, group therapy, and individual therapy.  [R389].

Plaintiff suggested that her mood disturbance had initially manifested when she was a teenager.  [R389].  She indicated that during that time, she was the victim of repeated sexual abuse and had multiple arrests for running away and for prostitution. [R390, 392].  She stated that in August 2008, a male friend died of a heart attack in front of her while she attempted to transport him to a fire station for help.  [R389].  She reported intermittent insomnia and consistent difficulties with nightmares, intrusive thoughts of seeing the face of the man who died, and feelings of guilt for being unable to assist him effectively.  [R389, 391].  She described intense mood swings in which she wants to fight and curse and has increased energy for up to one day.  [R391].  She reported an extensive history of cannabis dependence but stated that she had been clean for the past three months in an effort to regain custody of her children.  [R392].

Plaintiff also told Dr. Snook she interacted with her boyfriend three or four times per week, interacted consistently with her mother, and got along well with her mother and stepfather.  [R391].  Plaintiff reported having about three friends other than her boyfriend and stated that she occasionally spoke with one of her sisters on the phone.

11

[R391].  Plaintiff's boyfriend told Dr. Snook that Plaintiff spent her days cleaning and on the computer, [R391], and Plaintiff reported spending time reading novels and using social media web sites, such as Facebook, Monster.com, and MocoSpace.  [R390].  Plaintiff also reported that she independently saw to her hygienic needs, cleaned house, did laundry, and shopped for food items, and that she also prepared food, such as chicken, rice, eggs, and microwave meals.  [R390].

Plaintiff's boyfriend reported that he had to "talk to her a lot because she doesn't think the medication is working right.  It wears off too soon."  [R391].  He also described her as having "a split personality" and stated that she "gets angry and cries and is sad."  [R391].

On examination, Dr. Snook noted Plaintiff was cooperative and fully oriented, with fair eye contact and clear, understandable speech.  [R391].  Dr. Snook noted that Plaintiff did appear to be "rather irritable" and stated that he anticipated that Plaintiff "would likely have difficulty interacting with peers, supervisors, or the general public due to her degree of irritability and poor emotional containment."  [R391-92].  He also opined that Plaintiff would be capable of comprehending and carrying out simple but not complex directives effectively and that Plaintiff would be capable of adhering to work schedules and meeting appropriate production norms.  [R392].  The diagnoses

included cannabis dependence, in early full remission (per claimant report); nicotine dependence; and PTSD, chronic.  [R391].

In a Psychiatric Review Technique form dated December 22, 2010, nonexamining state agency review physician John Hollender, Ph.D., noted the existence of Affective Disorders, Anxiety-Related Disorders, and Substance Addiction Disorders. [R394].  With regard to Affective Disorders, Dr. Hollender found that Plaintiff had a disturbance of mood, accompanied by a full or partial manic or depressive syndrome, with the depressive syndrome characterized by anhedonia, sleep disturbances, feelings of guilt or worthlessness, and difficulty concentrating or thinking, and the manic syndrome characterized by flight of ideas.  [R397].  With respect to Anxiety-Related Disorders, Dr. Hollender found that Plaintiff's anxiety was evidenced by recurrent and intrusive recollections of a traumatic experience and that the recollections were a source of marked distress.  [R399].  Dr. Hollender opined that Plaintiff would have moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace.  [R404].

In a Mental Residual Functional Capacity ("RFC") Assessment also dated December 22, 2010, Dr. Hollender opined that there was no evidence of limitation in Plaintiff's ability to accept instructions, respond appropriately to criticism from

13

supervisors, get along with coworkers or peers without distracting them or experiencing behavioral extremes, or respond appropriately to changes in the work setting.  [R409].  He also found that there was no significant limitation in Plaintiff's ability to ask simple questions, request assistance, be aware of work hazards and take appropriate precautions, travel in unfamiliar places, use public transportation, set realistic goals, or make plans independently of others.  [R409].  Dr. Hollender did opine, however, that Plaintiff had moderate limitations in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness.  [R408-09].  Dr. Hollender also opined that Plaintiff was "not impaired" in the area of adaptive functioning and that although Plaintiff's suspiciousness and irritability caused her to be briefly inappropriate with others, he did not believe that any of Plaintiff's limitations were substantial.  [R410].

Notes from the DeKalb Community Services Board indicate that Plaintiff then began missing appointments and was last treated on February 16, 2011.  [R417].  In

AO 72A
(Rev.8/8
2)

June 2011, Plaintiff's treatment was discontinued after she failed to appear for scheduled appointments for more than 120 days.  [R416].

In March 2011, state agency psychologist Frances Breslin, Ph.D., reviewed the record.  [R58-63].  Dr. Breslin assessed moderate difficulty in maintaining social function and maintaining concentration, persistence, or pace, [R60], and opined that, despite these moderate difficulties, Plaintiff was not significantly limited in asking simple questions, requesting assistance, or maintaining socially appropriate behavior, and could perform work involving no intensive interaction with the public, only casual contact with peers, and direct and non-confrontational correction, [R63].  With regard to adaptive function, Dr. Breslin opined that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting and her ability to set realistic goals or make plans independently of others but could adapt to change introduced in a gradual, low-stress manner, avoid hazards, travel independently, and make day-to-day plans.  [R63].

15

A list of medications submitted on January 20, 2012, the date of the hearing before the ALJ, indicated that Plaintiff was taking Risperidone for bipolar and depression and was taking sertraline[8] for depression.  [R419].

### E.    Vocational-Expert Testimony

When asked about the availability of jobs for a hypothetical person of Plaintiff's age, education, and work history, who could understand, remember, and carry out simple tasks, who could work in the presence of others but should not be required to work in close coordination with others, and who should not be subjected to the stress of production work, the vocational expert ("VE") testified that the person could work as a hand packager, house sitter, and cuff folder.  [R49-50].  When asked about the availability of jobs for that person if she would interrupt her work two to three times per week with inappropriate or aggressive behavior toward coworkers, supervisors, or the public, for ten to fifteen minutes at a time, the VE stated that the person could not perform any work.  [R50-51].

---

[8]    Zoloft is the brand name for sertraline.  MedlinePlus, Sertraline, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html (last visited 9/7/15).

AO 72A
(Rev.8/8
2)

### III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant has not engaged in substantial gainful activity since July 16, 2010, the application date (20 CFR 416.971 *et seq.*).

. . .

2.   The claimant has the following severe impairments: bipolar disorder; unspecified affective psychosis; history of post-traumatic stress disorder ("PTSD"); and history of polysubstance abuse (20 CFR 416.920(c)).

. . .

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

. . .

4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels, but with non-exertional limitations. She is able to understand, remember, and carry out simple tasks. She should not be required to work in close coordination with others, but may work in the presence of others. In addition, she should not be subjected to the stress of production work.

. . .

5.   The claimant has no past relevant work (20 CFR 416.965).

AO 72A
(Rev.8/8
2)

. . .

6.    The claimant was born on September 21, 1984, and was 25 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that she can perform (20 CFR 416.969 and 416.969(a)).

. . .

10.   The claimant has not been under a disability, as defined in the Social Security Act, since July 16, 2010, the date the application was filed (20 CFR 416.920(g)).

[R16-22].

The ALJ explained that he did not fully credit Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms because he found her credibility to be questionable because her testimony was undermined by her own inconsistent conduct and statements and her testimony also conflicted with medical reports indicating that Plaintiff's condition responded to treatment.  [R19-21].  The ALJ

18

also explained that he gave great weight to Plaintiff's treating mental-health providers at the DeKalb Community Services Board and that he gave some weight to the mental assessments by the state agency psychological consultants and Dr. Snook "to the extent the assessments are consistent with the record."  [R20].

## IV.    PROCEEDINGS BEFORE THE APPEALS COUNCIL

In support of her petition to the Appeals Council, Plaintiff submitted a brief by her representative, [R219-21], and medical records from the Grady Health System dated December 7, 2004, through February 28, 2012, [R425-85].  [R7].

### A.    *Medical Records*

The medical records indicated that Plaintiff presented at the Grady Health System for a behavioral health diagnostic assessment on November 7, 2011.  [R431]. She reported that she had stopped taking her medication eight months prior and was having increased problems with nightmares, crying spells, emotional outbursts, mood swings, forgetfulness, insomnia, and loss of appetite.  [R431].  She stated that medication had helped her and said she did not know why she had stopped taking it. [R435].  It was noted that Plaintiff's mood was initially guarded but then open and cooperative.  [R431].  She indicated that her last job ended in 2007 and that she had completed tenth grade.  [R445].  A nurse noted that Plaintiff's mood was "angry" but

19

that she was cooperative with normal speech.   [R437].   The nurse also listed "parenting" and "people-oriented" among Plaintiff's personal strengths. [R437]. It was noted that Plaintiff wanted to restart medication.  [R442].

On November 18, 2011, Plaintiff visited Dr. Chevelle Brudey, M.D., at Grady for psychiatric treatment.  [R438].  Dr. Brudey indicated that Plaintiff was depressed, labile, irritable, and reactive, but cooperative, with good interaction and normal speech. [R439].  She was restarted on Risperdal and Zoloft and referred for individual therapy. [R439].

Plaintiff returned to Grady on January 13, 2012.  [R440].  She reported that her sleep and depression had improved but that her irritability was worse.  [R440].  She was noted to be cooperative upon examination and was continued on medication.  [R441].

Plaintiff visited Grady again on February 14, 2012.  [R432].  It was noted that Plaintiff was depressed and tearful at times, but was cooperative, with normal speech, good interaction, and fair judgment and insight.  [R432].

At a visit to Grady on March 1, 2012, Plaintiff reported that she had stopped taking the Risperal, stating that it "makes me a zombie."  [R426].  She stated that she felt at risk of having physical altercations secondary to her anger if she was not on effective medication but that she was currently still able to "walk away."  [R426].

20

Plaintiff was noted to be cooperative upon examination, with good interaction, normal speech, and fair judgment and insight.  [R427].

### B.   Appeals Council's Determination

Upon Plaintiff's request for review of the ALJ's decision, the Appeals Council reviewed Plaintiff's case but found no reason to determine that the ALJ abused his discretion; that there was an error of law; that the decision was not supported by substantial evidence; that there was a broad policy or procedural issue that may affect the public interest; or that after receiving the new evidence, the decision was contrary to the weight of all the evidence of record.  [R4].  Accordingly, the Appeals Council denied Plaintiff's request for review.  [R4-5].

## V.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic

21

techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age,

22

education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983),

AO 72A
(Rev.8/8
2)

*superceded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in*

*Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## VI.   SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits

by the Commissioner.  Judicial review of the administrative decision addresses three

questions:  (1) whether the proper legal standards were applied; (2) whether there was

substantial evidence to support the findings of fact; and (3) whether the findings of fact

resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296

(N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court

may not decide the facts anew, reweigh the evidence, or substitute its judgment for that

of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If

substantial evidence supports the Commissioner's factual findings and the

Commissioner applies the proper legal standards, the Commissioner's findings are

conclusive.  *Lewis v. Callahan*, 125 F.3d1436, 1439-40 (11th Cir. 1997); *Barnes v.

Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529

(11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam);

*Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth

v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

24

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ's decision will not be overturned where "there is substantially supportive evidence" to support it.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

Also, a "court must consider evidence not submitted to the [ALJ] but considered by the Appeals Council when that court reviews the Commissioner's final decision." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1258 (11th Cir. 2007).  In reviewing this additional evidence, the court must evaluate whether this "new evidence renders the denial of benefits erroneous." *Id.* at 1262.  This means that the court must

"determine whether the Appeals Council correctly decided that the '[ALJ's] action, findings, or conclusion is [not] contrary to the weight of the evidence currently of record.' " *Id.* at 1266-67 (quoting 20 C.F.R. § 404.970(b)).

## VII.   CLAIMS OF ERROR

Plaintiff argues that the ALJ (1) erred in his RFC determination by failing to make required findings or fully consider the evidence relating to Plaintiff's ability to respond appropriately to supervision, coworkers, and usual work situations, and (2) erred in his credibility determination by reaching the RFC determination first, then misstating evidence and failing to consider all of the evidence when he did evaluate Plaintiff's credibility, which (3) led the ALJ to pose an incomplete question to the vocational expert, thereby eliciting irrelevant testimony. [Doc. 11 at 8-14]. The Court addresses each allegation of error in the order it was raised in Plaintiff's brief.

### A.    *RFC Determination*

Plaintiff first takes issue with the ALJ's RFC determination that she "should not be required to work in close coordination with others, but may work in the presence of others," [R18].   [Doc. 11 at 8].   In support of this allegation of error, Plaintiff—correctly—points out that pursuant to Social Security Ruling ("SSR") 85-15, the basic mental demands of unskilled work include, among other things, "the abilities

26

(on a sustained basis) to . . . respond appropriately to supervision, coworkers, and usual work situations," and a substantial loss of ability to perform such basic work-related activities "would severely limit the potential occupational base," which may, in turn, result in a finding of disability.  [Doc. 11 at 8 (citing SSR 85-15 & SSR 96-8p (providing that a "sustained" or "regular and continuing basis" is the equivalent of an eight-hours-per-day, five-days-per-week work schedule))].  Plaintiff then argues that the ALJ's analysis did not satisfy SSR 85-15 because he did not make the required findings relating to responding appropriately to supervision, coworkers, and usual work situations, as the RFC references Plaintiff's limitations in her ability to work with "others," a group she contends "seems to involve only coworkers" and not supervisors or the public.  [Doc. 11 at 9-10 [citing R18]].  Plaintiff then points to evidence indicating that Plaintiff would have significant limitations dealing with supervisors and the general public on a sustained basis.  [Doc. 11 at 10-11 [citing R392 (Dr. Snook's opinion that Plaintiff would likely have difficulty interacting with peers, supervisors, and the general public due to her degree of irritability and poor emotional containment); R409 (Dr. Hollender's opinion that Plaintiff would be moderately limited in her ability to interact appropriately with the general public and to maintain socially appropriate behavior); R37 (Plaintiff's testimony that she left her last job due to conflict with a

AO 72A
(Rev.8/8
2)

manager); R44-45 (Plaintiff's testimony that she suffered from mood swings around others and would damage property or hurt herself or others when upset); R52-53 (Plaintiff's friend's testimony that Plaintiff did not get along with anyone, got mad at and tried to fight with people in the neighborhood, cried all the time, and was distractible)].

To the extent that Plaintiff contends that there is evidence that she has limitations in her ability to respond appropriately not only to coworkers but also to supervisors and the public, the Court agrees.  However, Plaintiff provides no support for her argument that the ALJ's reference to an ability to work with or around "others"—a broad term—should be read narrowly to refer only to coworkers and not to supervisors or the public.  [*See* Doc. 11 at 9-10].  It also bears noting that even if the RFC is read narrowly to exclude only work in close coordination with coworkers, Plaintiff has not argued that any of the jobs the ALJ found her capable of performing—hand packager, house sitter, or cuff folder—would in fact require Plaintiff to work in close coordination with supervisors or the general public.  *See Doughty*, 245 F.3d at 1278 n.2 (noting that it is the claimant's burden to prove that she is unable to perform the jobs that the Commissioner lists); *Young v. Astrue*, No. 8:09-cv-1056, 2010 WL 4340815, at *4 (M.D. Fla. Sept. 29, 2010) (noting that, in general, an error is harmless in a Social

28

Security case if it "do[es] not affect the ALJ's determination that a claimant is not entitled to benefits").

For these reasons, the undersigned finds nothing in Plaintiff's argument to suggest reversible error in the ALJ's consideration of her ability to work in close coordination with or in the presence of coworkers, supervisors, or the general public.

### B.    Credibility

Plaintiff also alleges that the ALJ erred in his evaluation of her credibility by basing his credibility decision, in part, on the mistaken impression that the mental-health treatment records from Grady were not in the record; illogically and improperly reaching his RFC determination prior to assessing Plaintiff's credibility; and never meaningfully discussing Plaintiff's abilities in relation to social interaction and stress. [Doc. 11 at 13]. The Court is not persuaded by any of these allegations of error.

First, the allegation that the ALJ never meaningfully discussed Plaintiff's abilities in relation to social interaction and stress is not presented as a developed argument. [Doc. 11 at 13]. Plaintiff does not explain how the alleged error impacted the credibility analysis, nor does she specify what evidence the ALJ purportedly failed to discuss. [*Id.*]. Thus, whatever argument Plaintiff seeks to make, it is not properly before the Court. *See, e.g., Sanchez v. Comm'r of Soc. Sec.*, 507 Fed. Appx. 855, 856

29

n.1 (11th Cir. Feb. 8, 2013) (per curiam) (noting that claimant waived certain arguments by not expressly challenging the ALJ's findings); *Outlaw v. Barnhart*, 197 Fed. Appx. 825, 827 n.3 (11th Cir. Aug. 10, 2006) (per curiam) (finding that the plaintiff waived an issue by failing to elaborate on his argument or provide a citation to authority regarding the argument).

Additionally, the undersigned finds that the ALJ's decision did include a meaningful discussion of Plaintiff's difficulties in maintaining social functioning, as he noted that Plaintiff was unable to get along with one of her sisters; repeatedly referred to Plaintiff's descriptions of her own moods as highly changeable, "irritable," and "real bitchy"; noted that Dr. Snook also found Plaintiff to be irritable; noted Plaintiff's testimony that she had lost a job due to interpersonal conflict and had a history of violence against herself, others, and property; and explained that he nevertheless considered Plaintiff to be only moderately limited in her social functioning, as she reported during the evaluation with Dr. Snook that she interacts well with her mother and stepfather, visits with her children, visits with one sister by telephone, interacts with others on social media, got along fairly well with her coworkers and supervisors during periods of employment, and lost the job in question not due to interpersonal conflict but instead due to a layoff.  [R17-20].

30

The Court recognizes that the ALJ did not specifically refer to Plaintiff's friend's testimony that she did not get along with anyone else in the neighborhood and that the ALJ did not expressly cite Dr. Snook's opinion that Plaintiff would likely have difficulty interacting with peers, supervisors, or the general public due to her degree or irritability and poor emotional containment. [*See* Doc. 11 at 11 (cited in support of Plaintiff's initial argument that the RFC did not properly exclude work in close coordination with supervisors and the general public)].  Such specificity is not necessary, however, so long as the decision is sufficient to allow the Court to conclude that the ALJ consider Plaintiff's medical condition as a whole.  *Taylor v. Comm'r of Soc. Sec. Admin.*, 213 Fed. Appx. 778, 781 n.1 (11th Cir. Dec. 6, 2006) (per curiam) (citing *Dyer*, 395 F.3d at 1211)).  As the ALJ repeatedly remarked upon Plaintiff's irritability and limited Plaintiff from working in close coordination with any others, it does indeed appear that he considered Plaintiff's medical condition as a whole. [*See* R18].  Thus, the Court finds no indication in this portion of Plaintiff's brief that the ALJ erred in his evaluation of Plaintiff's credibility.

Second, Plaintiff's argument that the ALJ erred by ignoring relevant medical records from Grady Hospital is belied by an attentive reading of the record:  the only records from Grady Hospital that were presented to the ALJ pertained to obstetric and

gynecological care administered in 2004, 2005, and November 2010, [R302-64, 420-24]. [R25-26]. The attorney-supplied evidence of mental-health treatment that Plaintiff references was not submitted until the case reached the Appeals Council. [R7].

Plaintiff does not argue that the Appeals Council failed to consider the new evidence or that the new evidence shifts the weight of the evidence so as to render the denial of benefits erroneous. Nor could she succeed on such an argument, as examination of the new records reveals findings very much in line with the ALJ's opinion: while Plaintiff presented to Grady in November 2011 with complaints of increased problems with nightmares, crying spells, emotional outbursts, mood swings, forgetfulness, sleeping, and appetite, it was also noted that Plaintiff had stopped taking her medication eight months prior for no reason, despite it having helped her, [R431, 435]; notes indicate that Plaintiff was generally cooperative with the healthcare providers, [R427 (noting Plaintiff to be cooperative upon examination, with good interaction, normal speech, and fair judgment and insight); R431 (observing that although Plaintiff's mood was initially guarded, she then became open and cooperative); R432 (noting that Plaintiff was depressed and tearful at times, but was cooperative, with normal speech, good interaction, and fair judgment and insight);

32

R439 (indicating that Plaintiff was depressed, labile, irritable, and reactive, but cooperative, with good interaction and normal speech); R441 (noting that Plaintiff was cooperative upon examination); R437 (indicating that Plaintiff came across as "angry" but was cooperative with normal speech and seemed "people-oriented")]; Plaintiff provided yet another inconsistent statement about the last grade she had completed in school, [R445]; and although she complained that one of her medications made her "a zombie," she also reported that her sleep and depression had improved and indicated that the medication helped control her anger, [R426]. Also notable is the fact that the resumed treatment commenced only about two months before the hearing before the ALJ. [*Compare* R28 *with* R428]. The Court therefore finds no reversible error in the ALJ's or the Appeals Council's consideration of the Grady mental-healthcare treatment notes.

Third, the Court is not persuaded that the ALJ approached the credibility assessment illogically or that the credibility determination is not supported by substantial evidence. [Doc. 17 at 22-23].

Relying on SSR 96-7p and a number of unpublished cases from District Courts in New York applying the Seventh Circuit's holding in *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012), Plaintiff faults the ALJ's finding that Plaintiff's

33

medically determinable impairments could reasonably be expected to cause the alleged symptoms but that her statements concerning the intensity, persistence, and limiting effects of the symptoms were "not credible to the extent they are inconsistent with the finding of residual functional capacity," [R19]. [Doc. 11 at 13]. Plaintiff suggests that the statement shows that the ALJ failed to consider the entire case record and improperly determined Plaintiff's ability to work before determining her credibility. [*Id.* at 12-13].

Curiously, Plaintiff does not cite any Eleventh Circuit authority in support of the argument. [*See id.*]. Nevertheless, even presuming that Plaintiff has offered a correct statement of law as it is applied in this circuit, review of the ALJ's decision shows that he made no such error in this case.

It is true that where an ALJ decides not to credit a claimant's testimony regarding subjective allegations of disability, he must articulate explicit and adequate reasons for doing so. *Holt*, 921 F.2d at 1223. And clearly, an administrative decision containing the boilerplate statement that the claimant's statements about her symptoms are "not credible to the extent they are inconsistent with the finding of residual functional capacity" merits close review to ensure that the claimant's testimony has been considered in determining the RFC and has not been treated merely an inconvenient

34

afterthought.  *See Bjornson*, 671 F.3d at 645 (discussing the "troubling" and repeated use of the boilerplate paragraph to reject claimants' testimony "without linking the conclusory statement contained therein to evidence in the record" (internal quotation marks omitted)); *see also Dyer*, 395 F.3d at 1211 (holding that a decision may not simply be "a broad rejection" that does not allow the reviewing court to determine that the ALJ considered the claimant's medical condition as a whole).

Here, however, the ALJ did not simply issue a broad rejection of Plaintiff's testimony regarding the subjective effects of her symptoms, but instead, he considered Plaintiff's overall medical condition and placed on the record explicit reasons for rejecting portions of her testimony and finding that her impairments were not severe enough to be disabling. *See* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (providing that in evaluating subjective complaints, the ALJ must "consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence"); SSR 96-7p (providing that "the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision

AO 72A
(Rev.8/8
2)

that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence"). [*See* R18-20].

As discussed above, the ALJ not only noted—correctly—that there were no treatment notes of record supporting Plaintiff's testimony at the hearing that she was currently receiving mental-health treatment at Grady Hospital, but he also noted inconsistencies between Plaintiff's testimony and her out-of-court statements and conduct, and he also remarked upon medical findings that called into question whether the intensity, persistence, and limiting effects of Plaintiff's impairments were as severe as she alleged. [R19-21]. Specifically, the ALJ noted that Plaintiff missed appointments and withdrew from treatment with the DeKalb Community Services Board in 2011 at a time when her depression was considered severe and her substance abuse was considered moderate by the health care providers; medical records showed that Plaintiff's sleep and moods stabilized when she participated in regular mental health treatment at DeKalb Community Services Board and complied with her psychiatric medication regimen; the medical evidence of record did not clearly include reports from Plaintiff that her psychiatric medication caused sleeping problems or other side effects; Plaintiff's report to Dr. Snook that she got along fairly well with coworkers and supervisors and lost her last job because she was laid off conflicted with her

36

testimony that she stopped working at her last job because of an interpersonal work conflict and is unable to work, in part, because she finds it hard to be around people; her claims of inability to concentrate were undermined by her statements to Dr. Snook that she used a computer for social networking and visited web sites such as Facebook, Monster.com, and MocoSpace and by Dr. Snook's determination that her memory recall was grossly intact, she was able to maintain adequate attention and concentration to carry out simple tasks, and she was able to adhere to work schedules and meeting production norms; and Plaintiff failed to supply details regarding her work history and could not account for approximately $12,000 of self-employment income for tax year 2007 that is reflected on her earnings records and tax returns.  [R19-21].  He also gave credit to the assessment of Dr. Hollender, who opined that Plaintiff was "not impaired" in the area of adaptive function and that although Plaintiff's suspiciousness and irritability caused her to be briefly inappropriate with others, he did not believe that any of Plaintiff's limitations were substantial, [R410].  [R20].

In light of this extensive discussion, the Court finds that the ALJ's credibility determination was not an impermissibly broad rejection of Plaintiff's testimony, as Plaintiff seems to suggest, but was instead a detailed, generally well-reasoned explanation.  *See Dyer*, 395 F.3d at 1210-11; *Holt*, 921 F.2d at 1223; SSR 96-7p.

AO 72A
(Rev.8/8
2)

Consequently, the ALJ's consideration of Plaintiff's credibility provides no grounds for reversal.

### C.     VE Testimony

Plaintiff argues that because the ALJ erred in considering her credibility and in crafting the RFC, the hypothetical question posed to the VE was necessarily incomplete and therefore could not evoke substantial evidence to support the ALJ's decision. [Doc. 11 at 14].  Having determined that Plaintiff has failed to show that the ALJ committed reversible error either in his consideration of Plaintiff's credibility or in his RFC determination, the Court likewise finds no basis for a determination that the hypothetical question was lacking.  Accordingly, Plaintiff's challenge to the VE testimony also provides no grounds for a finding of reversible error.

## VIII.  CONCLUSION

For the reasons above, the Court **AFFIRMS** the final decision of the Commissioner.   The Clerk is **DIRECTED** to enter final judgment in the Commissioner's favor.

**IT IS SO ORDERED and DIRECTED**, this the 10th day of September, 2015.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)